SAMUEL SCOTT MINTON,

                Plaintiff,

    -against-

BRADLEY COUNTY, TENNESSEE;
ANTHONY BENEFIELD; WILLIAM BURTT;
and DANIEL GILLEY,

            Defendants.

No.

**COMPLAINT AND
JURY DEMAND**

      Plaintiff Samuel Scott Minton, by and through his attorneys Kaufman Lieb Lebowitz & Frick LLP and Spears, Moore, Rebman & Williams, P.C., alleges as follows:

## INTRODUCTION

1.       This is a civil rights action arising from the wrongful prosecution and conviction of Plaintiff Scott Minton for a rape and armed burglary that allegedly occurred in Cleveland, Tennessee on October 31, 1993.

2.       Mr. Minton is innocent of the crimes for which he was convicted. At the time of the alleged incident, Mr. Minton was an hour away from the purported crime scene, running errands and working on fixing his car. His ironclad alibi was corroborated by time-stamped receipts and eighteen alibi witnesses who reported seeing him that morning.

3.       Nevertheless, Defendants Bradley County Sheriff's Office and its individual investigators baselessly determined that Mr. Minton had committed the crime and set

about securing his conviction at the cost of Mr. Minton's constitutional and state law rights to due process and a fair trial.

4.      Defendants coerced Mr. Minton, a vulnerable and functionally illiterate 20-year-old man with an intellectual disability, into providing a false confession, feeding him facts about the alleged incident to make the confession appear credible. Defendants rigged suggestive identification procedures that were engineered to produce a positive identification of Mr. Minton as the perpetrator, and they failed to do basic police work that would have indicated Mr. Minton's demonstrable innocence, such as dusting for fingerprints at the crime scene or investigating the complainant's credibility.

5.      As a result of the wrongful acts and omissions of the Defendants as alleged herein, Mr. Minton was wrongfully convicted and incarcerated for over 31 years before he was exonerated and released.

6.      To say that Defendants' unlawful actions ruined Mr. Minton's life would be a vast understatement. Mr. Minton's wrongful incarceration caused him unimaginable suffering, and this action seeks to hold Defendants accountable for the tremendous harm their conduct caused.

## PARTIES

7.      Plaintiff Samuel Scott Minton, who goes by the name Scott Minton, is 53 years old and resides in Dayton, Rhea County, Tennessee.

8.      Defendant Bradley County is a municipal entity organized under the laws of the State of Tennessee.

9.      Defendant Anthony Benefield was at all relevant times a Detective in the Bradley County Sheriff's Office, acting under color of state law. He is sued in his individual capacity.

10. Defendant William Burtt was at all relevant times a Detective in the Bradley County Sheriff's Office, acting under color of state law. He is sued in his individual capacity.

11. Defendant Daniel Gilley was at all relevant times the duly elected Sheriff of Bradley County and acted as "the principal conservator of the peace" therein, with the duty and power "to ferret out crimes, to secure evidence of crimes, and to apprehend and arrest criminals." Tenn. Code Ann. § 38-3-102. He is sued in his individual capacity.

## JURISDICTION AND VENUE

12. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a).

13. Venue in this Court is proper under 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claims occurred in this judicial district.

## JURY DEMAND

14. Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

### *Leslie Faye Watson Reports Being the Victim of a Dramatic, Armed Home Invasion Robbery*

15. At around 11:15 a.m. on October 31, 1993, Leslie Faye Watson telephoned her next-door neighbor, Lonnie Lynn. Ms. Watson asked Mr. Lynn to come over to the home where she lived with her elderly parents, Henry and Ella Farr. Mr. Lynn later recalled that Ms. Watson did not specify why she needed him to come over, but he sensed some urgency in her voice.

16. Because he was uncomfortable going to Ms. Watson's home alone, Mr. Lynn asked his wife, Janice, to go with him. When the Lynns arrived, they found Ms. Watson

lying nude on her living room floor, covered only by a hand towel. She had a gunshot wound to her thigh.

17.    Lonnie Lynn was struck by the fact that he had not heard any yelling or screaming that morning, nor had he seen a car drive up to the home where Ms. Watson lived. The Lynns' driveway ran close to Ms. Watson's, and their dogs always barked when a car drove up, but the dogs had not alerted to anything unusual that morning.

18.    The Lynns called 911, and Bradley County Deputy Sheriff Roxanne Blackwell responded to the scene and found Ms. Watson lying in the middle of the living room, covered by a blanket.

19.    Ms. Watson said she had been shot in the leg. She also appeared to have burn marks across her body.

20.    Deputy Blackwell stayed with Ms. Watson and attempted to keep her calm until an ambulance arrived to transport Ms. Watson to Bradley Memorial Hospital.

21.    At around 12:15 p.m., shortly after Ms. Watson arrived at the hospital, Detective Bob Hyden of the Bradley County Sheriff's Office ("BCSO") interviewed Ms. Watson about the alleged incident.

22.    Ms. Watson told Detective Hyden that she was in her living room when she heard someone come in through the back entrance.

23.    She told Detective Hyden that she turned around and saw a boy holding a knife in his hand. She described the boy as a white male who was under six feet tall and no more than 20 years old. She said the boy had "brownish hair, long in back, short on top" and was wearing "khaki colored/camouflage pants and shirt."

24.    Ms. Watson told Detective Hyden that the boy demanded her money.

25.     Ms. Watson said that she took the boy to her bedroom and emptied $200 from her purse, but that the boy demanded more.

26.     Ms. Watson told Detective Hyden that she then saw a "dirty" 16- to 17-year-old white female who was 5'6" to 5'7", weighed 100 pounds, and had dirty blonde hair. Ms. Watson said she dressed in grey shorts with a "dingy" white sweatshirt.

27.     Ms. Watson said that the girl tied her up in the living room with knee high stockings and demanded more money.

28.     She said that the perpetrators burned her all over her body with a cigar.

29.     She said that the boy put his penis in her mouth and put a "can of something" into her vagina.

30.     She also claimed that the boy urinated on her.

31.     Ms. Watson said that she then heard a third person, a male, shout from another room that he had found what he wanted and that the others should leave Ms. Watson alone.

32.     Ms. Watson claimed that she never saw this other male perpetrator's face or upper body and that she only heard his voice and saw his legs. Ms. Watson said he appeared to be heavy-set, and she thought he was wearing jeans.

33.     Ms. Watson said that the boy then put a gun into her mouth, and then stuck it to her leg. She said that the gun accidentally went off, after which the perpetrators ran away, dropping the gun.

34.     Ms. Watson told Detective Hyden that she grabbed the gun and fired it after the perpetrators. She then got up and called the Lynns for help.

35.     During this interview, Ms. Watson did not claim to recognize any of the perpetrators, and she did not identify any of them by name.

36.    Ms. Watson also never mentioned that any amount of money was missing from her house.

37.    None of the notes or reports prepared by the BCSO personnel nor Ms. Watson's hospital records indicated that Ms. Watson had been urinated on as she had claimed. When Ms. Watson later testified about the alleged incident, she omitted that allegation from her description.

### *Investigators Focus on Scott Minton, Despite an Ironclad Alibi and the Absence of Any Evidence Connecting Him to the Crime*

38.    Before Detective Hyden had even interviewed Ms. Watson at the hospital, the BCSO decided that a man named Shannon Blaylock was a person of interest in the nascent investigation. Mr. Blaylock and his brother, Chris Blaylock, had been foster children in Ms. Watson's home from June 1987 until November 1989—at a different house from where the attack allegedly occurred.

39.    To this day, it remains unclear how Mr. Blaylock's name initially came to the attention of BCSO investigators.

40.    Although Deputy Blackwell later claimed that Ms. Watson had mentioned Mr. Blaylock's name while they were waiting for the ambulance, her report makes no mention of Ms. Watson having recognized or named any of her assailants. When Detective Hyden interviewed Ms. Watson at the hospital—in the presence of Officer Blackwell—Ms. Watson did not claim she knew the names of any of her attackers. Neither Detective Hyden's handwritten memorialization of Ms. Watson's 12:15 p.m. statement nor his contemporaneous notes contain any indication that she recognized any of her assailants or provided any of their names.

6

41.     Nonetheless, by about 11:50 a.m. on October 31, 1993, BCSO investigators were on their way to Rhea County, where Mr. Blaylock lived, to interview him.

42.     They located Mr. Blaylock at a mobile home in Rhea County where Plaintiff Scott Minton lived with his girlfriend, Crystal Rohland.

43.     At the time, Mr. Minton was 20 years old and 5'8" tall. The youngest of seven children, Mr. Minton spent much of his childhood in foster care. He struggled with learning difficulties throughout his schooling and was placed in special education classes. Although he nominally completed eighth or ninth grade, Mr. Minton never learned to read or write beyond his own name.

44.     When BCSO investigators arrived at Mr. Minton's mobile home at around 12:45 p.m. on October 31, 1993, they found Mr. Minton and Mr. Blaylock working on repairing Mr. Minton's car, which was hoisted on blocks. Ms. Rohland was also present along with Mr. Blaylock's girlfriend, Angela Manning, and several others.

45.     Mr. Minton was wearing green coveralls.

46.     Investigators asked Mr. Blaylock, Mr. Minton, and Ms. Manning to go to the Rhea County Sheriff's Department to be interviewed about the alleged assault.

47.     Mr. Minton understood himself to be under arrest.

48.     Beginning around 1:15 p.m. on October 31, Mr. Minton was questioned for hours in Rhea County by investigators from both the Rhea and Bradley County Sheriff's Departments.

49.     Over the course of questioning him that day and in the days that followed, investigators provided Mr. Minton with details about how the assault on Ms. Watson had allegedly occurred. They told him that she had been sexually assaulted, tied up with brown pantyhose, and anally penetrated. Investigators told Mr. Minton that the perpetrators had

entered Ms. Watson's home through the back door, had burned her with cigars or cigarettes, and had stolen money from the house.

50. Mr. Minton explained to investigators that he had been in Dayton, Tennessee—about an hour away from Cleveland—all morning running errands and working on his car.

51. Mr. Minton told the detectives that he had run these errands using his sister Patricia's car, which was distinctive-looking because it appeared to have been in a significant collision.

52. Mr. Minton provided a detailed account of his whereabouts, which was confirmed by eighteen witnesses—many of whom were disinterested third parties—as well as multiple pieces of documentary evidence.

53. As he informed the detectives, Mr. Minton woke up between 8:30 a.m. and 8:40 a.m. in his home in Dayton.

54. He planned to fix his car that day.

55. Shortly after waking up, Mr. Minton went next door to his brother Michael Minton's home to get transmission parts and a floor jack.

56. Mr. Minton then met up with his friend, Shannon Blaylock, and the two of them went to Advance Auto Parts in Dayton.

57. They arrived at 9:00 a.m., and were told by Scott Logan, an Advance Auto Parts employee and auxiliary deputy with the Rhea County Sheriff's Office, that the store did not open until 10 a.m.

58. Mr. Minton and Mr. Blaylock then drove to Collie's Auto Parts, but they were also closed.

59.     The two men then went to a local Conoco Station to get gas. Rita Jordan and Chris Wilkey, two Conoco Station employees, saw Mr. Minton and Mr. Blaylock that morning. Receipts from their visit show that they purchased gas at 9:15 a.m. and then received a refund at 9:17 a.m. after Mr. Minton could not get the gas cap on the car to unlock.

60.     While at the Conoco Station, Mr. Minton and Mr. Blaylock began having trouble starting the car, so they borrowed a screwdriver from a man driving a white Toyota to see if they could get it started.

61.     When the car still would not start, Mr. Minton asked the man in the Toyota for a ride to his grandmother's house to pick up his uncle, Jesse Gibson, who lived there.

62.     Mr. Minton arrived at the home of his grandmother, Willie Mae Gibson, around 9:30 a.m. and woke up Jesse Gibson around 9:38 a.m.

63.     Mr. Minton asked Mr. Gibson for help boosting his car, and the two went to a few family members' houses in the neighborhood in an unsuccessful search for jumper cables.

64.     Between 9:45 a.m. and 9:50 a.m., they managed to track down some cables, and Jesse Gibson and Mr. Minton headed back to the Conoco Station, where Shannon Blaylock had remained with Mr. Minton's car.

65.     At 10:00 a.m., they got the car running and drove back to Advance Auto Parts, which had just opened, and purchased two items on separate transactions: a screwdriver and a transmission seal.

66.     Advance Auto Parts employees Scott Logan, John Heath, and Alvin Ruddick assisted with these two purchases and provided Mr. Minton with two separate time-

stamped receipts that documented purchases at 10:06 a.m. and 10:16 a.m. Mr. Minton later provided investigators with these receipts, corroborating his alibi.

67. Mr. Minton, Mr. Blaylock, and Mr. Gibson then drove to Sue Ann's gas station where they bought a gallon and a half of kerosene.

68. They then went back to Scott Minton's house to work on the car, where they arrived at around 11:00 a.m.

69. Susan Smith, who lived with Scott's brother Michael Minton, saw Scott Minton at his brother's home at 11:05 a.m. Michael Minton's home was located directly behind Scott Minton's home.

70. Michael Minton also saw Scott Minton at his house at around 11:00 a.m., after which he briefly left the house. When he returned around 12:30 p.m., Scott was still there.

71. In the course of questioning Mr. Minton, Bradley County detectives drove him to the Advance Auto Parts store in Dayton, where a store clerk—who also happened to be a City Council Member and retired postal worker—confirmed that Mr. Minton had made purchases at the store that morning. Another person also confirmed that Mr. Minton had been in the store and made the purchases documented on the receipts.

72. After Mr. Minton had endured hours of questioning in Rhea County, BSCO Detectives transported him to the Bradley County Sheriff's Office, where he was held until the early morning hours of November 1, 1993.

73. Finally, officers told Mr. Minton that they would let him go if he provided consent to search his trailer. Although he could not read any of the documents that investigators placed in front of him, Mr. Minton signed them anyway so that he could go home.

74.     BCSO officers drove Mr. Minton home. Upon their arrival, they thoroughly searched Mr. Minton's trailer and vehicle, but never found any of the money supposedly missing from Ms. Watson's home. Nor did they find any other physical evidence connecting him to the alleged assault and robbery, such as a knife or clothing that matched Ms. Watson's description of what the perpetrators wore.

### Defendants Use Coercive Tactics to Pursue Mr. Minton

75.     Despite the lack of any reliable evidence pointing to Mr. Minton as a suspect, the police continued to pursue his arrest using unlawful and coercive tactics.

76.     Police returned to Mr. Minton's trailer on November 1, demanding to talk to him again.

77.     Police drove Mr. Minton back to Rhea County Sheriff's Department, where he was questioned for approximately six hours before being released a second time.

78.     On November 2, as Mr. Minton was returning home from work, BCSO Detective Phil Mathews approached him and told him that he needed to return to the Rhea County Sheriff's Office for further questioning.

79.     Mr. Minton was subsequently held at the Rhea County Sheriff's Office for another six hours, after which he was handcuffed behind his back, placed in a police car, and transported to the Bradley County Sheriff's Department.

80.     During that drive, Detective Mathews drove approximately 95 miles per hour with Mr. Minton handcuffed in the backseat, initially unsecured by a seatbelt.

81.     During the drive to Bradley County, Defendant Burtt rode in the passenger seat. For the duration of the journey, Burtt turned to face Mr. Minton and loudly berated and threatened him. He cursed at Mr. Minton, called him a "dog," a "son of a bitch," a

"motherfucker," and a "damn liar." Burtt held his hand in Mr. Minton's face, with his finger approximately half an inch from Mr. Minton's nose.

82. Defendant Burtt demanded that Mr. Minton get it in his head that he was guilty of raping, attacking and robbing Ms. Watson.

83. Mr. Minton repeatedly asked for a lawyer during the drive. Detective Benefield noted in a report he completed after Mr. Minton's arrival at the BCSO that "Minton had told Bill Burtt that he was going to call a lawyer earlier."

84. After Mr. Minton arrived at the Bradley County Sheriff's Department, the detectives asked him if was ready to confess.

85. When Mr. Minton responded that he would not confess to something that he did not do, Detective Burtt continued to tell Mr. Minton that he, Mr. Blaylock, and Ms. Manning had committed the crime.

86. Because Mr. Minton refused to confess, detectives put him in the "drunk tank" for about an hour.

87. Thereafter, Mr. Minton was formally booked into the Bradley County jail. At Defendant Burtt's direction, he was placed in a cell with no running water and a toilet that did not flush.

88. Because BCSO detectives had taken Mr. Minton's clothes, he was completely naked in the cell.

89. While Mr. Minton was in this cell, Detective Burtt again told Mr. Minton that he would confess to the crime, one way or another.

90. Isolated, fearful and confused, Mr. Minton began to feel as though he was losing his mind.

91.     After he was in the cell for an hour, Defendants told Mr. Minton that he could leave if he made a statement.

92.     Mr. Minton agreed to make the statement if it meant he could leave, and he was brought to an interview room at the BCSO.

93.     Over the prior two days, BCSO personnel had fed Mr. Minton numerous, specific details about the alleged attack. Before he even began giving his statement on November 2, BCSO personnel had told Mr. Minton, among other things, that multiple perpetrators were involved, that they entered through the back door, that the victim had suffered burns and a gunshot wound, that the pistol was found in the bedroom, that there had been a rape, and that money was stolen.

94.     Defendant Benefield led the interrogation of Mr. Minton on November 2, 1993. Defendants Burtt and Gilley were also present.

95.     Defendant Benefield began by switching on a tape recorder to document the interrogation. With the tape recorder running, Mr. Minton again asked for a lawyer. But instead of ceasing the interrogation until Mr. Minton could have counsel present, Defendant Benefield told Mr. Minton that he would have to stop and rewind the tape because Mr. Minton could not say he wanted a lawyer on the recording.

96.     Detective Benefield then proceeded to conduct a coercive, leading, and manipulative interrogation that was practically engineered to produce a false and fabricated confession.

97.     It is difficult to imagine a suspect more predisposed to falsely confess under pressure than Scott Minton. His intellectual disability made him prone to suggestion and influence by authority figures. His tendency toward powerful and overwhelming emotional reactions to stress and anxiety—which investigators had witnessed during their

previous interactions with him—made it nearly impossible for him to resist the pressure of a police interrogation and motivated him to say whatever was necessary to end the upsetting ordeal of being questioned.

98.     Defendants also conducted the interrogation under circumstances that they knew or should have known created a heightened risk of suggestion and fabrication. By the time of his false confession, Mr. Minton had been questioned for hours at a time over the course of three consecutive days. Mr. Minton had also repeatedly provided extensive alibi evidence that investigators had simply disregarded, choosing instead to insist that he was guilty and lying about it. Mr. Minton thus understood that Defendants would not accept any response other than an admission of guilt, and that confessing was the only way to end the interrogation.

99.     Mr. Minton was isolated and understood that he would be forced to live in a cell with no running water until he confessed. In the interview room, he was alone with three senior law enforcement officials, who unrelentingly repeated to Mr. Minton that he was guilty and made clear that the stress of the interrogation would end only if he accepted and adopted their narrative.

100.     Defendants also used interrogation tactics that are known to increase the risk of false confession. One such tactic, known as "maximization," involves emphasizing the seriousness of an offense and the likelihood of severe consequences in order to elicit a confession. Defendants Benefield and Gilley repeatedly engaged in this tactic during the November 2 interrogation, repeating to Mr. Minton that he was guilty, that his protestations of innocence were lies, and that he could not escape punishment no matter what.

101.    Defendants also engaged in "minimization," another tactic known to increase the likelihood of false confessions, which involves downplaying the offense— such as by suggesting that it was unintentional or justified—in order to make the prospect of confessing seem less daunting. Defendants repeatedly employed minimization tactics during Mr. Minton's interrogation, rationalizing his supposed involvement in the alleged assault by reminding him that he had never done anything similar before. They also attempted to create a deceptive rapport with Mr. Minton, insisting during the interrogation that they had been particularly "nice" to him during their interactions over the course of the investigation.

102.    Crucially, Defendants knowingly contaminated Mr. Minton's statement, supplying details of the alleged assault on Ms. Watson both before and during the interrogation. Defendant Benefield later testified that he took this approach to questioning Mr. Minton—after he had already provided a detailed statement of his whereabouts at the time the crime had allegedly occurred—because suspects "don't always tell the truth on the first statement, and after we present other facts to them and give them other opportunities then they have a change of heart and a change of mind."

103.    Defendants introduced facts about the assault during their questioning of Mr. Minton so that he would adopt and incorporate them into his responses, thereby burnishing the credibility of his otherwise unconvincing and unreliable confession.

104.    For instance, Defendant Benefield supplied details about the mode in which the home invasion was allegedly carried out. It was Defendant Benefield, and not Mr. Minton, who first mentioned that Ms. Watson was supposed to have been at church when the robbery occurred. After Mr. Minton said that "they" had tied up the victim, Defendant Benefield insisted that Mr. Minton had been the one to do so. When Mr. Minton was

unable to answer where he supposedly found the bindings used to tie up Ms. Watson, Defendant Benefield suggested that they had been found while "going through the drawers," leading Mr. Minton to adopt that explanation. Defendant Benefield also introduced the idea that a gun had been used during the attack and that it had been found inside Ms. Watson's home and that Mr. Minton called Mr. Blaylock by his first name during the attack.

105.    Defendant Gilley, for his part, introduced the idea that Mr. Minton had demanded $200 from Ms. Watson's purse and had handed the money to Mr. Blaylock.

106.    Defendant Benefield also supplied Mr. Minton with details about the sadistic abuse Ms. Watson had supposedly suffered during the attack. He insisted to Mr. Minton during the interrogation that he "was the one that had the cigar" and introduced the idea that the victim had cigarette burns on her chest, had had her clothing removed, and had been urinated on.

107.    Defendants fed these details to Mr. Minton to create the appearance of a statement given by someone with insider knowledge of the alleged crime. Defendants knew or should have known that Mr. Minton was simply adopting the account of his supposed actions that they were supplying to him. At one point during the interrogation, Defendant Benefield instructed Mr. Minton: "I need you to tell me more than just, 'yes, sir.' It sounds like I'm— You are just answering me, 'Yes, sir.'"

108.    Unsurprisingly given his lack of actual involvement, Mr. Minton repeatedly expressed during the interrogation that he did not know or could not remember central details about the attack on Ms. Watson and the surrounding events. Mr. Minton at times became confused as he tried to keep track of the narrative Defendants wanted him to adopt. At one point, when Defendant Benefield asked about who had driven the getaway

vehicle, Mr. Minton stated: "I'm about backwards." Later, when Defendant Benefield asked him why he had burned the victim with cigarettes, Mr. Minton responded: "I don't know, I'm about half mental I reckon."

109. Mr. Minton sobbed so profusely throughout the interrogation that Defendants could not understand him at times.

110. Mr. Minton has since maintained that his November 2, 1993 statement was false, and he only gave it because officers promised to let him out of his cell if he did.

111. In reality, once the interrogation was concluded, Mr. Minton was placed back in the cell and kept him there for ten days without phone privileges or running water.

### Defendants Use Suggestive Identification Methods to Manufacture Evidence Against Mr. Minton

112. In addition to using coercive methods to elicit Mr. Minton's false confession, the police also used suggestive identification methods to prompt Ms. Watson to identify Mr. Minton as one of her attackers.

113. On October 31, Detective Phillip Mathews showed Ms. Watson a photo array at her house.

114. Ms. Watson viewed four sets of photographs: two sets of men and two sets of women.

115. Police never told Ms. Watson that it was possible that the photographs did not contain an actual suspect.

116. Although the photographs Ms. Watson viewed included a photograph of Mr. Minton, she told the police that she could not recognize any of men in the photographs. She claimed she could not identify a male suspect because her eyes were swollen.

117. Nevertheless, she identified Ms. Manning as the female perpetrator.

118.    Despite Ms. Watson's description of the female perpetrator as a 16-year-old woman with dirty blond hair, the photographic array containing Ms. Manning included some photos of women who were clearly considerably older than sixteen and some of women who did not have dirty blond hair.

119.    On November 1, Detective Mathews showed Ms. Watson another photo array at her house, consisting of one set of six photographs of men.

120.    Ms. Watson immediately recognized Chris Blaylock, Shannon Blaylock's brother, and said that he was not involved in the crime.

121.    She again said that her eyesight prevented her from identifying anyone else.

122.    The individuals in the photo arrays that Ms. Watson viewed did not resemble each other or the description that Ms. Watson gave of the assailants.

123.    The individuals varied widely in their appearance—for example, some were heavyset and some were thin.

124.    The individuals in the male photo arrays appeared to be a random composite of white men, rather than men who matched Ms. Watson's descriptions of her attackers.

125.    Mr. Minton did not match Ms. Watson's initial description of her assailant.

126.    On November 2, after Mr. Minton's false confession, Detective Benefield put together a live lineup for Ms. Watson to view at the Bradley County Sheriff's Department.

127.    Detectives asked Ms. Watson whether any suspects looked familiar, and Detective Benefield told Ms. Watson that she could ask any questions she wanted.

128.    Detective Benefield was in the room with Ms. Watson during the lineup.

129.    The line-up consisted of five individuals, including Mr. Minton.

130.    This was the second time that Ms. Watson saw Mr. Minton during an identification procedure, as she had already seen him in the October 31 photo array in which she had told police she did not recognize any of the men pictured.

131.    When a witness has been exposed to a suspect after the incident in question—for example, though an earlier identification procedure—the risk of misidentifying that suspect increases substantially because the suspect appears familiar to the witness.

132.    When the lineup was presented to Ms. Watson, the other four individuals— *not* Mr. Minton—went out first together.

133.    Mr. Minton then followed the group of four alone.

134.    When Ms. Watson viewed the line-up the first time, she asked to see subjects two and five again because she believed they had similar "coloring" and builds.

135.    After viewing subjects two and five again, she selected subject two, Mr. Minton, as one of the assailants.

136.    Research shows that the longer it takes someone to identify a suspect, the less likely it is that they have identified the person based on true facial recognition, rather than other factors. For example, when a person views a lineup photograph for more than five seconds, it results in a selection that is about as accurate as a random guess.

137.    It took Ms. Watson more than four minutes to select Mr. Minton from the live line-up. She also appeared to rely on factors other than facial recognition, as demonstrated by the fact that she asked to view two candidates more closely and then determined that the filler candidate was "bigger" than Mr. Minton.

138.    The procedures that police used to have Ms. Watson identify Mr. Minton were unduly suggestive. They steered Ms. Watson toward Mr. Minton over other possible suspects.

139.    It was unduly suggestive of police to show Ms. Watson a photo array that included Mr. Minton and then show her a live line-up in which Mr. Minton was the only person who had also appeared in the photo array.

140.    It was also unduly suggestive of police to first send out four individuals for the line-up and then send out Mr. Minton separately, as it suggested that he was already in custody or held in a separate area (which he was).

141.    Apart from the suggestive procedures, Ms. Watson's identification of Mr. Minton was also highly unreliable.

142.    Ms. Watson herself claimed that her eyelids were burned with cigarettes at the beginning of the incident, hindering her eyesight.

143.    In addition, she would have had trouble focusing on her perpetrators' faces given the stressful and frightening circumstances under which she allegedly observed them.

144.    Further, Ms. Watson gave differing, evolving, and contradictory descriptions of the perpetrator over time, suggesting a very low level of reliability in her ability to select the perpetrator out of a line-up or photo array.

145.    If Ms. Watson had truly recognized Mr. Minton as the perpetrator, her description of the perpetrator would have been consistent and matched Mr. Minton, she would have identified Mr. Minton in the photo array, and she would have immediately identified Mr. Minton when she saw him in the live line-up.

146.     Also on November 2, Ms. Watson viewed a photo array showing only the pants and shoes of five people, one of which was Shannon Blaylock. She identified Mr. Blaylock.

147.     Mr. Blaylock was the only person in the "waist-down" line-up who was wearing dirty shoes.

### Defendants' Flawed Investigation

148.     In addition to conducting an improper, suggestive line-up, the police failed to do basic police work to investigate Ms. Watson's account of an alleged home invasion.

149.     Officers did not dust Ms. Watson's house for fingerprints, despite the fact that Ms. Watson reported that the perpetrators searched all over her home.

150.     The failure to examine for latent fingerprints was particularly egregious because Ms. Watson reported that one of the male perpetrators had dirty fingernails—indicating he was not wearing gloves. Additionally, since she reported only seeing the second male perpetrator from the waist down, she would not have known whether he wore gloves.

151.     Officers never interviewed Ms. Watson's neighbors on either side of the house to check if they saw an unfamiliar car parked in her driveway or heard gunshots.

152.     Officers never swabbed Mr. Minton with a gunshot residue kit—a process that takes only a couple of minutes.

153.     Investigators were with Mr. Minton within approximately two hours of the crime, and there was nothing suggesting that he had taken any steps to clean any gunshot residue off of himself, nor any reason to believe he would have been aware that it was even possible to forensically test for such residue.

154.    In addition, the police collected several items of physical evidence from Ms. Watson's home because they believed they were connected to the crime, but then never tested those items for DNA, fingerprints, or other evidence.

155.    Specifically, the police collected, but did not test, a potpourri spray can (which Ms. Watson reported was forced inside of her vagina), a bottle of Ciara-brand lotion, and a pair of nylon stockings with knots in them.

156.    The police also never obtained an analysis of Ms. Watson's rape kit, even though the hospital conducted a rape exam and detectives swabbed Mr. Minton for comparison samples.

157.    Given Ms. Watson's allegations of rape, a rape kit analysis could have provided objective forensic evidence to inculpate or exculpate Mr. Minton.

158.    Detective Hyden testified at trial that no rape kit was conducted because there was no indication of genital-to-genital contact or semen.

159.    At the hospital, a physician noticed an abrasion on Ms. Watson's vaginal vault, but no lacerations, tears, bleeding, or other injuries that would have been consistent with the severe sexual assault that Ms. Watson reported.

160.    The police also conducted a flawed investigation with respect to the gun and bullets found at the scene.

161.    Ms. Watson had claimed that the .22 caliber pistol fired into her thigh while one of her attackers was handling it, prompting them to drop the gun and flee. She claimed that she grabbed the gun and immediately fired at the perpetrators as they fled. But the only two spent rounds in the gun's chamber when police found it were non-consecutive, with two unfired full rounds between them. Ms. Watson's account of two

consecutive shots was thus inconsistent with the alignment of the rounds in the chamber when the police recovered the gun.

162.    Although Ms. Watson claimed that Shannon Blaylock had telephoned her the day before the attack, the police never checked Ms. Watson's phone records to verify whether she received a call from Mr. Blaylock the day prior to the incident. Investigators eventually subpoenaed phone records from five residences, including Mr. Minton's home and the home Shannon Blaylock's grandmother's homes (where Mr. Blaylock lived). There was no record of any phone call from any of these locations being placed to Ms. Watson's home on October 30—the day she claimed Mr. Blaylock called her.

163.    Police ignored facts that supported Mr. Minton's alibi and failed to investigate information that could have exonerated him.

164.    For example, it took between 45 minutes to an hour and 15 minutes to drive from the Advance Auto Parts in Dayton to Ms. Watson's parents' home in Cleveland because the two locations were not connected by road. To get from one location to the other, drivers had to wait to cross the Tennessee River via car ferry.

165.    Investigators never spoke to any ferry workers to verify whether the car that Mr. Minton was driving that morning—which was distinctive-looking because it had been in a crash—had crossed the river on the ferry the morning of October 31.

166.    Investigators never determined whether it was even physically possible for Mr. Minton to have traveled to Ms. Watson's parents' home in Rhea County and back to his trailer in Bradley County that morning, especially because he was using his sister's badly damaged vehicle.

167.    Finally, police never investigated Ms. Watson's background or questioned her credibility *at all*—despite ample reason to do so.

168.     Ms. Watson's accounts of the alleged incident evolved over the course of her interactions with the police, adding new details she had not mentioned in her initial statement and in some cases contradicting information she had previously provided.

169.     Investigators failed to question the reliability of Ms. Watson's physical descriptions of her alleged attackers, even as physical descriptions of the perpetrators changed and evolved with each statement she provided to investigators.

170.     Ms. Watson also added and changed central details about how the attack had occurred. For example, although Ms. Watson had made no mention of an anal sexual assault during her interview with Detective Hyden at the hospital, she later told him during a second interview that "the first boy tried to put something up my rectum." During that second interview, she also told Detective Hyden that the other perpetrators had referred to the male attacker whose face she could not see as "Shane"—a nickname used by Shannon Blaylock—despite making no mention of this self-evidently critical fact in her first statement.

171.     Defendant Benefield interviewed Ms. Watson on November 1, 1993, the day after the alleged incident. During that interview Ms. Watson claimed for the first time that the male perpetrators had referred to the female assailant by name, despite failing to provide any such information when Detective Hyden had interviewed her twice the previous day.

172.     During the November 1 interview, Ms. Watson also claimed for the first time that Shannon Blaylock—with whom she had not spoken for at least several months previously—had called her the day before the attack to say that he was considering coming to visit her the next day. Ms. Watson told Defendant Benefield that Mr. Blaylock had asked whether she was planning to go to church the next day and that she had told him

she was sure she would go. There is no record that Detective Benefield took any steps to clarify why the victim of a violent home invasion had failed to mention to the police during multiple prior interviews that one of her alleged assailants had inquired in advance about her anticipated whereabouts at the time the crime occurred.

173. Ms. Watson later admitted that the person on the phone did not identify himself as Shannon Blaylock, that she had not talked to him for months prior to the call, and that she also often did not recognize Mr. Blaylock's voice when he called on the phone. She also could not explain how Mr. Blaylock would have known that she was staying at her parents' home at the time or would be reachable there.

174. Ms. Watson also did not mention during any of her initial interviews with the police that any money was missing from her home. Ms. Watson and her father later claimed that approximately $7,600 in cash that her parents had intended to use to prepay their funeral expenses had gone missing from the house at the time of the attack. It does not appear that BCSO investigators ever documented learning that information during their investigation.

175. It was not until a November 9 court hearing that Ms. Watson claimed, for the first time, that the boy with the knife anally raped her with his penis and that the female perpetrator forced her to perform and receive oral sex. She had never mentioned these details in any of her prior statements to police.

176. Had these discrepancies prompted the police to investigate Ms. Watson's background or question her credibility, they would have learned that she had a history of deceptive behavior, which included burning herself with cigarettes and blaming others for it, staging a fake burglary, and staging a kidnapping in exchange for a ransom.

177. In addition, an investigation into Ms. Watson's background would have shown that she had previously engaged in fraudulent schemes to obtain money, including stealing from her family, writing bad checks, and promising to pay something on behalf of a family member but ultimately keeping the money to herself. Indeed, Ms. Watson was the subject of an outstanding arrest warrant in Bradley County for writing bad checks that had been issued on October 22, 1993—just nine days before she reported being attacked and robbed at her home.

178. Prior to the 1993 incident, Ms. Watson was also involved in at least three fires that occurred under unusual circumstances. For example, in two fires that occurred to Ms. Watson's residences, someone had removed family photos and other personally meaningful items before the fires started.

179. At a minimum, this information would have cast significant doubt on Ms. Watson's credibility as a victim. More likely, however, it would have caused the BCSO to look more closely at the inconsistent "facts" of the incident—including the non-consecutive gun rounds, the fact that neighbors never saw a car or heard gunshots, and the alibis of the perpetrators Ms. Watson identified—and conclude that it very likely never happened at all.

180. Defendants maintained their tunnel-vision focus on Mr. Minton and failed to reassess the reliability of the evidence against him even as key components of their theory crumbled. For instance, Defendants prompted Mr. Minton to claim during his fabricated confession that Crystal Rohland had driven him, Ms. Manning and Mr. Blaylock to Ms. Watson's house the morning of the attack and that Ms. Rohland had waited by the back door during the assault. However, prosecutors were later forced to drop the charges against Ms. Rohland and concede that the evidence did not support "a

26

reasonable likelihood of a conviction" were Ms. Rohland to be tried for her alleged involvement.

### *Mr. Minton Is Arrested, Convicted, and Exonerated*

181.    Following Mr. Minton's false confession and Ms. Watson's identification, Mr. Minton was arrested and indicted on one count of conspiracy to commit aggravated burglary, five counts of aggravated rape, one count of especially aggravated kidnapping, one count of especially aggravated robbery, one count of especially aggravated burglary, and one count of theft over $1,000.

182.    Prior to this arrest, Mr. Minton had no serious criminal history.

183.    Mr. Minton's trial began on March 29, 1994.

184.    Based on the false confession Defendants engineered and the eyewitness identification by Ms. Watson that Defendants obtained through improper suggestion, Mr. Minton was convicted at trial and sentenced to 76 years in prison.

185.    When he heard the verdict, Mr. Minton was in disbelief. He felt like the world was ending.

186.    Mr. Minton was incarcerated from the time of his arrest in November 1993 until he was finally exonerated over 31 years later.

187.    On or about December 10, 2024, the Criminal Court of Bradley County, Tennessee for the Tenth Judicial District granted Mr. Minton's petition for post-conviction relief and vacated his convictions pursuant to Tenn. Code Ann. § 40-30-111(a).

188.    The Court found that new scientific evidence concerning false confessions and the reliability of eyewitness identification established by clear and convincing evidence that Mr. Minton is actually innocent.

189.    On or about January 23, 2025, the Criminal Court of Bradley County entered amended judgments dismissing all of the charges against Scott Minton.

190.    During his time in prison, Mr. Minton witnessed and experienced unimaginable indignities and violence. He was terrified for much of his life in prison.

191.    In 1997, another inmate threw paint thinner in Mr. Minton's face and stabbed him 36 times. He was hospitalized and barely survived.

192.    More recently, another inmate sliced Mr. Minton's earlobe from behind. His earlobe was left dangling from his head and had to be sewn back on.

193.    On other occasions, he witnessed harrowing mistreatment and violence inflicted on other prisoners. He witnessed an inmate being stripped naked, tied up and beaten with a belt by a fellow prisoner while corrections officers looked on, inert. He witnessed a prisoner being anally penetrated with a broomstick, another having his throat slit, and another being gangraped. He watched two friends scream in pain when they were scalded with a mixture of boiling water, baby oil and salt. He saw the body of another friend hanging lifeless from a wall.

194.    Mr. Minton's wrongful incarceration also denied him the opportunity to pursue normal relationships with, and enjoy the companionship of, his family and friends.

195.    Mr. Minton was denied years of gainful employment and income as a result of his incarceration. His earning power and ability to support himself have been permanently hampered as a result of losing years of productive work experience.

196.    Mr. Minton has been publicly shamed, disgraced and humiliated because of the ordeal of being falsely accused and convicted of a heinous crime. Nothing can undo the reputational damage he has sustained.

197.   Mr. Minton was released from prison after spending over 31 years—including his entire 20s, 30s, and 40s—in prison for a crime he did not commit.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fabrication of Evidence – Fourteenth Amendment
(Against Defendants Benefield, Burtt, and Gilley)

198.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

199.   At all relevant times, Defendants Benefield, Burtt and Gilley acted under color of law in investigating Plaintiff.

200.   Defendants knowingly fabricated evidence against Plaintiff, including without limitation by using suggestive procedures to obtain Ms. Watson's identification of Plaintiff and by supplying Plaintiff with investigative details concerning the alleged assault on Ms. Watson and prompting him to incorporate them into the statements he gave on November 2, 1993, to burnish the credibility of the false confession they had engineered.

201.   This fabricated evidence was likely to, and ultimately did, influence the jury's verdict finding Plaintiff guilty.

202.   Plaintiff was wrongfully convicted and incarcerated as a result.

203.   Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Fabrication of Evidence – Fourth Amendment
(Against Defendants Benefield, Burtt, and Gilley)

204.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

205. At all relevant times, Defendants Benefield, Burtt and Gilley acted under color of law in investigating Plaintiff.

206. Defendants knowingly fabricated evidence against Plaintiff, including without limitation by using suggestive procedures to obtain Ms. Watson's identification of Plaintiff and by supplying Plaintiff with investigative details concerning the alleged assault on Ms. Watson and prompting him to incorporate them into the statements he gave on November 2, 1993, to burnish the credibility of the false confession they had engineered.

207. This fabricated evidence was presented to the grand jury that indicted Plaintiff, whose erroneous finding of probable cause substantially rested on the fabricated evidence.

208. Plaintiff was unreasonably seized and detained as a result.

209. Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Violation of the Right Against Self-Incrimination – Fifth Amendment
(Against Defendants Benefield and Gilley)

210. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

211. Defendants Benefield and Gilley denied Plaintiff his Fifth Amendment right to counsel and used coercive tactics to overbear Plaintiff's will during their questioning of Plaintiff on November 2, 1993.

212. Taking into account the totality of the circumstances, including without limitation the duration and nature of the questioning and Plaintiff's education, intellectual capacity, and emotional state at the time, Defendants' conduct violated

Plaintiff's right against self-incrimination and coerced Plaintiff to falsely incriminate himself.

213.     Plaintiff's coerced confession was used against him at trial, and Plaintiff was wrongfully convicted and incarcerated as a result, resulting in the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 – Unduly Suggestive Identification – Fourteenth Amendment
(Against Defendant Benefield)

214.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

215.     Defendant Benefield conducted an unnecessarily suggestive line-up that created a substantial likelihood that Plaintiff would be misidentified.

216.     Plaintiff was wrongly identified as a result of the suggestive procedures used by Detective Benefield, in violation of his due process rights.

217.     The identification of Plaintiff obtained during the unreasonably suggestive line-up was used against Plaintiff at trial and proximately caused Plaintiff's wrongful conviction and incarceration, resulting in the damages hereinbefore alleged.

### FIFTH CAUSE OF ACTION
42 U.S.C. § 1983 – Malicious Prosecution – Fourth Amendment
(Against Defendants Benefield and Burtt)

218.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

219.     Defendants Benefield and Burtt participated in the flawed investigation of Plaintiff as hereinbefore alleged and made, influenced, and/or participated in the decision to prosecute Plaintiff.

220. On or about November 9, 1993, Defendant Benefield swore out the Affidavit of Complaint against Plaintiff charging him with participation in the alleged assault on Ms. Watson, while Defendant Burtt witnessed the affidavit.

221. There was no probable cause to prosecute Plaintiff, and the grand jury's finding of probable cause was tainted by the presentation of false and unreliable evidence manufactured by Defendants.

222. As a consequence of Defendants' conduct in pursuing criminal charges against him, Plaintiff suffered a deprivation of liberty for the decades he spent unjustly incarcerated.

223. The proceedings terminated in Plaintiff's favor when all charges against him were dismissed.

224. As demonstrated by their gross deviations from acceptable police procedures and reliance on unreliable and fabricated evidence, Defendants acted deliberately and/or recklessly in pursuing false criminal charges against Plaintiff.

225. Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION
42 U.S.C. § 1983 – Failure to Intervene
(Against Defendants Gilley and Burtt)

226. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

227. Defendants Gilley and Burtt observed and otherwise had reason to know that Plaintiff's constitutional rights were being violated during the course of the November 2, 1993 interrogation.

32

228.    Defendants Gilley and Burtt had a realistic opportunity to intervene and prevent the harm to Plaintiff, but failed to do so and instead acquiesced and participated in the violation of Plaintiff's rights.

229.    Plaintiff was wrongfully convicted and incarcerated as a result.

230.    Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Municipal Liability
(Against Defendant Bradley County)

231.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

232.    At all relevant times, Defendant Gilley was the duly elected Sheriff of Bradley County and acted as "the principal conservator of the peace" therein, with the duty and power "to ferret out crimes, to secure evidence of crimes, and to apprehend and arrest criminals." Tenn. Code Ann. § 38-3-102.

233.    Under Tennessee law, Defendant Gilley acted as a municipal policymaker for Bradley County as to law enforcement decision-making. *Spurlock v. Sumner Cty.*, 42 S.W.3d 75, 82 (Tenn. 2001); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 786 (W.D. Tenn. 2015).

234.    Defendant Gilley was personally present for and participated in the interrogation of Plaintiff on November 2, 1993, and otherwise made a deliberate choice to permit and condone the use of unreliable and fabricated evidence in the investigation and prosecution of Plaintiff. Defendant Gilley ratified the decision to prosecute Plaintiff and deprive him of liberty on the basis of a flawed investigation and unreliable and fabricated evidence.

235.   Defendant Gilley's acts and omissions in his capacity as the County's final policymaker with respect to law enforcement were the moving force behind the violation of Plaintiff's constitutional rights and caused his damages as hereinbefore alleged.

### EIGHTH CAUSE OF ACTION
Malicious Prosecution Under Tennessee Law
(Against Defendants Benefield and Burtt)

236.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

237.   Defendants Benefield and Burtt initiated the prosecution of Plaintiff. Both Defendants participated in the flawed investigation of Plaintiff as hereinbefore alleged. On or about November 9, 1993, Defendant Benefield swore out the Affidavit of Complaint against Plaintiff charging him with participation in the alleged assault on Ms. Watson, while Defendant Burtt witnessed the affidavit.

238.   There was no probable cause to prosecute Plaintiff, and the grand jury's finding of probable cause was tainted by the presentation of false and unreliable evidence manufactured by Defendants.

239.   The proceedings terminated in Plaintiff's favor when all charges against him were dismissed after the Criminal Court of Bradley County found that Plaintiff's "actual innocence" had been established "by clear and convincing evidence."

240.   As demonstrated by their gross deviations from acceptable police procedures and reliance on unreliable and fabricated evidence, Defendants acted with malice and/or improper motives in pursuing false criminal charges against Plaintiff.

241.   Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## NINTH CAUSE OF ACTION
Negligence Under Tennessee Law
(Against Defendant Bradley County)

242.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

243.    At all relevant times, the Bradley County Sheriff and deputies involved in investigating Ms. Watson's alleged assault owed Plaintiff a duty to exercise reasonable care in their investigation of crimes.

244.    One or more employees of Bradley County, acting in the scope of his or her duties, breached at duty of care by the acts and omissions hereinbefore alleged.

245.    Such negligence proximately caused the damages hereinbefore alleged.

## TENTH CAUSE OF ACTION
Tenn. Code Ann. § 8-8-302

246.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

247.    Plaintiff was wronged and injured and incurred losses and damages resulting from acts and failures to act on the part of Bradley County Sheriff's Deputies as hereinbefore alleged.

248.    Such deputies were, at the time of the acts and omissions that caused Plaintiff's injuries, acting by virtue of or under color of the office of the Sheriff.

249.    Under Tennessee law, Plaintiff is entitled to bring suit against Bradley County for the acts and omissions of such deputies, and the governmental immunity of the County is waived pursuant to § 8-8-303 of the Tennessee Code.

35

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.     Compensatory damages in an amount to be determined;

2.     Punitive damages in an amount to be determined;

3.     Pre-judgment interest as allowed by law;

4.     An order awarding Plaintiff reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.     Such other further relief as the Court may deem just and proper.

Dated:  December 9, 2025.          Respectfully submitted,

By:  /s/ David Lebowitz
David Lebowitz (application for admission *pro hac vice* forthcoming)
Alanna Kaufman (application for admission *pro hac vice* forthcoming)
KAUFMAN LIEB LEBOWITZ & FRICK LLP
18 E. 48th Street, Suite 802
New York, New York 10017
Telephone:  (212) 660-2332
dlebowitz@kllflaw.com
akaufman@kllflaw.com

By:  /s/ Joseph Alan Jackson II
Joseph Alan Jackson II, BPR No. 030203
Katelyn Elizabeth Murdock, BPR No. 042409
(applications for permanent regular admission and admission *pro hac vice* forthcoming)
SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
601 Market Street, Suite 400
Chattanooga, Tennessee 37402
Telephone: (423) 756-7000
Facsimile: (423) 756-4801
jaj@smrw.com
kem@smrw.com

*Counsel for Samuel Scott Minton*